May it please the court. No, I represent Dr. Fatemi. He believes that she was fired by the University of Arkansas from her job as a resident in neurosurgery because of her gender. The university has come up with an explanation, a the judge is there to judge two orders the second which is the one that's most relevant but in my opinion I'd like to persuade the court that he stands the rule of summary judgment on its head. I think if you sit down and look at that second order he recites here's the evidence and then he'll say what he making decisions about credibility of witnesses he's never seen. He's given inferences to the university and not to Dr. Fatemi and he's ignoring a great deal of evidence. Now discovery was not complete in this case when he entered it but there was a very extensive discovery but it wasn't completed and I don't have a complaint about that. We've reached the stage where it's perfectly clear she didn't she couldn't prove an element of her case but I would understand she's gonna suffer summer judgment because she needs four elements and one of them she just has no evidence but in this case it's not situation. The court of appeals doesn't defer to any factual assumptions the district court has made. Thank is not disfavored but it's also an extreme remedy and as I mentioned it basically says you're not going to get a trial by a jury and generally people understand to have a factual dispute particularly with a governmental agency they can have a trial by jury in this case the judge is saying no because I don't believe you I do believe the university and these different statements about various facts come up and I'm going to make conclusion as to which what might wait to give that and I think this I think that was council what's the language from the court's order that you cite where the court says that it is making a credibility determination it says for instance what or four people said this about dr. Fatimi and she says that's not true there's well you know no jury could ever believe dr. Fatimi he says that in that order he didn't use those words but he that's what his conclusion is he says well she claims that she got along with her one but look at all these complaints that she couldn't get along with other people well I could just pick out one instance she says that there was a argument there's agreement she was arguing on the telephone she was speaking way too loudly she's using her outside voice in the Children's Hospital she was very angry she says in about one minute she cooled down she felt that she's being called a liar the person who was identified as being the other side he said well gee I was in my car and I didn't I would have never spoken that loudly and said well let's have those two parties get on the stand and let's see if the jury could say that was a reasonable reaction on her part because she was she I understand from what her deposition says that she was saying the person that was talking to dr. Castro dr. Castro was saying that another doctor has said she's talking about you to Castro behind your back and she's in that's not true and maybe maybe we should get all three of those people in and have them testify and let the jury decide who to believe as the circumstances of that event your honors the problem we face is we're in the protectional stage the university has given a perfectly legitimate explanation why they fired her on its face but is it really the explanation what went on well once you remember this phrase you smell like garlic now I have friends who are East Indians and Pakistanis and they tell me that this accusation of smelling like garlic to them is like someone using the n-word to an African American but there's some reason I didn't mean when I read that didn't mean much to me but I asked him they said oh that's the signal this person really dislikes or looks down on on a suppose whatever different terms of the integration she doesn't use garlic never uses garlic he says this in the middle of a operation she's extremely disconcerted and then he tells her to leave I think it's that one sentence right there it fits with a number of the cases and for instance guys in your your comments by parties which could possibly allow a jury to say you know we think that the alleged reason is given for not hiring these two applicants for firefighter physician are actually pretextual because why would this chief say these things why would this chief see that you know if I can draw upon my personal experience for just one second I was an officer in the Marine Corps and we have to go through officer candidate screening and it's like boot camp but it's kind of the opposite boot camp because they're trying to get you to quit we see if you just don't have the gumption to lead 45 Marines in the combat and I can remember one day we're standing with their rifles and we would take turns playing sergeant just to see can you demonstrate leadership of your classmates with you and they called out Candace Smith I'll say and there was the drill instructor and he leans over and whispers to this other drill instructor I didn't hear what he said but the other drill instructor was stranger to us he suddenly found no matter what Smith did it was wrong you shouldn't do this and Smith got extremely rattled and he didn't quit but he did end up leading a motor pool where he's supervising mechanics not leading 45 Marines in combat it's I had to think of that when I read about this comment about you smell like garlic one it's not true she didn't couldn't smell like garlic and two it's and I don't know if he was aware of how strong this is to people from the Middle East but she took great great offense so she was staggered when he said that in front of all these people she the there's the doctor says that she didn't know how to hold a scalpel correctly she'd already done 40 surgeries no other doctor said she had a problem holding the scalpel correctly he said the doctor Fatima to testify that the operation this neurosurgical operation was you're going to go through the back of the head she gets in there and he asked her what are the muscles of the neck and she thought or back to anatomy class and she thought what's it what are the muscles of the neck have to do it we have you don't know the muscles neck you just break scrub and get out of here and she felt again she was being humiliated and to my mind she's that second drill instructor he was he was going to make a case against her is bound and termina make it and yes there weren't very many women in the program now they liked it to go and talk about well we had one woman who was the star resident in her fourth year where she was murdered well that was a Arkansas her husband transferred University of Arkansas she transferred from Iowa State they I doubt if they ever had a woman who had gone to Harvard and Cornell Medical School before but they but she landed in their lap unfortunately she was killed they didn't recruit her they didn't successfully bring her in she just came to him because you happen to be a trailing spouse the other person they say well we have this other doctor and she quit because in a brief they sit they claim she quit because she was stunned by the the murder not in any statement by dr. makes that she say that she says I was more interested in interventional radiology since she never mentions the murder in any fashion all the material about to change but the brief comes up with that so the reason I want to mention no women had ever graduated is that we have over a hundred years and male-dominated area of surgery and particularly the utterly male-dominated subsubstantially of neurosurgery was excluding just couldn't find any woman to to get in there and other universities were doing it University Arkansas was doing a grossly inadequate job and dr. day is part of that establishment and I can't and you can't look into his heart and say he hated women or he thought women weren't gonna be good surgeons in this case he made it clear to dr. Fatemi he didn't think she had the most basic competence contrary to the to this comments and and rating of all of her other attending doctors who were in this 40 operations with her not a single one of them said she couldn't hold a scalpel until she got into this one not seeing one said you know the muscles of the neck my heart and she said she couldn't remember him later she she looked at an anime book and well of course I knew all those terms it didn't come to me I'm saying what is the why she asked about the neck why did you ask about the neck so the pretext the evidence of pretext is there and it and this record is saying no jury could believe that it's pretextual oh yes they could they could remember you smell like garlic you can remember one of the neck muscles when the surgery is not going through the neck they could remember that she's the only woman who is going to go through their neurosurgery program to attend but somehow she she's the one resident that doesn't make it I have I have a claim what about your retaliation claim are you still pursuing that on appeal pursuing what the retaliation claim no that one's been dropped it's wrong no alright the other one is your 1983 constitutional claims have you raised are you still pursuing the 1983 constitutional claim we want no what we we're here around the gender discrimination gender discrimination what we want is the University to say she would did a good job some people felt her she was difficult to deal with but she not to the extent it was destroying her usefulness on on the team and we don't we don't fail to recommend her you know they went out of his way he wrote to everyone who ever gave her a recommendation and said you know what you said is not true and you shouldn't writing more nice letters about her saying to these other doctors dr. Kelly your experience with her doesn't mean anything and to me that this speaks of malice now they defendant saying he had an ethical duty to do that well all we want basically is for the University to give us a declaration that they don't have to don't have to fall on their sword and say we discriminate but they I want them to say not that stop saying negative things about her as a surgeon and as a person so she can go find other employment she's been unemployed since this she she she is arrested in neurosurgery she may decide to go into research I don't know but she would like for the doors in neurosurgery not to be closed because she was fired from this young job by dr. day if you don't have any other questions I'll just give up the rest my time okay thank you I think I've reserved three minutes and I hope I don't need to use all they have about a minute and a half okay okay I mean I've made my point and unless you have questions I came actually came down from Kansas City to answer your questions but if you don't have any more fine okay thank you thank you okay mr. Kaplan morning good morning you can lower that there's a button right there to your right that you can adjust that I'm fine may it please the court I am Phil Kaplan I represent the defendants along with my co-counsel Sherry Robinson and Lucy Ingram of the general counsel's office of the University of Arkansas system I think that we need to start with the courts articulation of the non-discriminatory reason he passes fairly quickly over the prima facie case and I think it's not doesn't make any sense to try to deal with whether there was a prima facie case made in this case he articulates the judge does that our articulation of the non-discriminatory reason were that her skills were not consistent with a pgy2 that she had a lack of professionalism that there was not sufficient improvement since the April the 6th probationary period for her to have acceptable professional relationships and that she had a compromised ability to properly care for patients now supporting that he goes on to say there are multiple instances of her disruptive behavior repeated refusals to take responsibility for her problems in interacting with University and hospital officials that her off that their office offers of help were met with open hostility that she had an inability to work well and with others and therefore compromised patient care that there were multiple accounts beginning almost at the first day captain are you saying that all of those findings are undisputed I'm saying that all of them are undisputed with facts to rebut any of them contrary to her position and the statement this morning by counsel for example take the telephone argument she is sent over to Arkansas Children's Hospital for those of you not from Arkansas Arkansas Children's Hospital does not have its own professional medical staff it has a contract with UAMS with the medical school to provide all of the physician so she is sent over to because of her continuing problems and her disruptive behavior and inability to get along dr. Pate who at the time was the acting chief says well okay let's send you over to Children's Hospital to see if you can have a fresh start over there well almost immediately virtually immediately that first day she has this disruptive argument over the phone now the court says and dr. day says later on why what reason do I have what possible reason do I have to distrust what the nurses have said with regard to what your behavior was she presents no factual evidence as is required under long-standing law in the Eighth Circuit of a factual basis for disrupting it what she says is I didn't do that well you have said time and time again in case after case that her self-serving statements are not facts and if at the pretext stage she has to come forward with proof not self-serving statements not her affidavit or 72 page affidavit post deposition to start to try and dispute that well not only that the the issue with the telephone conversation for which he has no other proof I mean no proof period all they all that dr. day has and dr. Pate had at the time was their good faith reliance on what those nurses said she also says well everybody knows that the nurses were much more critical at ACH mr. Kaplan it's hard to prove the negative although I suppose she could have gotten person on the other side other end of the telephone call to give an affidavit but is your position that that the decision-makers here they had a report from the nervous nurses and they had a report from the plaintiff here and that it's really not necessarily pertinent for our purposes that whether who's true what's true and what's false is they had a right to rely on the nurses over her denial particularly in a case where this wasn't the first time yes they had a good faith basis for relying on what the reports are were Polchinski this case we've cited in several places and Polchinski says exactly that that when a decision-maker has a good faith basis and she comes forth not with anything to dispute any of the good faith by any of the physicians that made reports about her what she says your honor is that almost from the first week well not almost the first week the first few days she is discriminated against and the person who hired her dr. Pate was the one who hated her she says time and again dr. Pate hated me and that it began when I complained that first week about sex discrimination I'll talk about the garlic incident in just a minute because it doesn't relate to anything with regard to sex but what she says is that well and the only thing she points to with regard to sex discrimination that first week is that dr. Gandhi a PG PG y1 was bossing her around well the fact is and this is undisputed the fact is that dr. McDonnell asked dr. Gandhi who had been an undergraduate at the medical school graduate medical student at UAMS he had done a rotation through neurosurgery he had a one-year post doc or post yes post doc fellowship would you please orient dr. Fatemeh around the hospital and the use of the various computers and patient records things like that she he was asked to do that for both Tabusha dr. Tabusha who was a PG y3 and for dr. Fatemeh Tabusha said there were no problems I he oriented me it's clear that that's exactly what Gandhi was supposed to do and Gandhi reports that very first week an incident in the operating room where she creates a scene by yelling at him and he he reports that he was distressed by her activity and that it disrupted the who are they supposed who are the dr. Pate and dr. Day and dr. McDonnell to believe with regard to in good faith when there is nothing nothing to show that dr. Gandhi was acting in bad faith that she said dr. Tabusha and dr. Kat DeCastro also discriminated against her in bad faith dr. Pate did dr. Day there's nothing to show that any of those four people and Tabusha of course was not any kind of a decision maker and neither was dr. DeCastro that doctors Pate McDonnell or day were acting in any kind of bad faith there's no proof of any of that what weren't there wasn't there assertion though that there was no follow-up when she made a complaint that then there was no follow-up to talk to the person that she alleged was on the other side of the conflict there are two responses in two areas judge Kelly one dr. Pate did talk to both Tabusha and Gandhi before the March 23rd meeting and both of them denied that there was any kind of discrimination involved with regard to her claim in her brief that there was no investigation after her complaint to the university to the dean's office to dr. Pfizer dr. Clardy began an investigation almost immediately he testified the record is clear he spoke in small groups to everybody in neurosurgery he determined that there was no kind of discrimination based on sex whatever and then he talked to her and her her reaction throughout members of the court is it's not my fault nothing was ever her fault what she says is in response to my questions to her deposit in her deposition at page 265 Pate grew to hate her after she complained about sex discrimination she complained the first or second week in February Pate didn't like it at all he grew to hate her gradually when she felt that he was retaliating against her at 257 she wasn't doing anything to cause a problem it was UAMS discrimination against her that was a problem she told dr. Kelly you know this is another one of these things that's so unusual in this case she keeps writing to these physicians at institutions where she had had some experience before telling them about her experience and about how everybody hates her she says that they never showed her anything they never told her anything she says that that she was never told how she could improve but both the letters that were given to her the one on the 6th on April the 6th by dr. Day and then the more robust full scope letter of the 10th which was given to her on the 19th make it very clear what she had to do in order to improve herself and and what happens even the week that she gets terminated and she's terminated on the 25th not at the time that there is a letter from her lawyer in California there is the incident that again demonstrates how ill-prepared she is to deal with other members of the the residency crew she tries to get into the quiet room where they were sleeping and pounds on the door and makes a big scene about it and when they report that to dr. Day she sends well I think they're going she sends a memo to him I think they're going to report me for this well of course they're going to report her for that this is just another example in this whole long line is there any any time where in all of this where she is able to show those things that need to be shown that there is for example a genuine issue of material facts she has to do more than simply show that there's some metaphysical doubt about material facts she smelled like garlic you were told this morning does that have anything to do with sex you know originally she had a national origin claim to arguably that could have had could have had something to do with a national origin claim she claims well because I'm Middle Eastern everybody most every all of the names that you're hearing in this case are Middle Eastern names or South Asian names it's hard for anybody familiar with UAMS both the medical staff as well as this cadre of interns to say that there's any kind of prejudice against anyone from outside of the United States no matter where they're from you know Judge Smith in in Ebersol there is a an interesting description by you of comparators in this case she doesn't have a single comparator she says my comparator is to Tabusha the one comparator that she does point to that is arguably the same is this NS who had been terminated several years before and you recall in Ebersol you said well here is the one comparator that seems to be similar he was terminated also that very same day well many years before NS was terminated and then she says well he was allowed to serve out his full term as a PGY but I wasn't she was given that opportunity and she refused to resign so that she was not given that opportunity so in terms of the one comparator that she has he was treated exactly the same way okay thank you mr. Kaplan thank you stones will give you a minute and a half here Kaplan I mean exactly we did in a brief well well we got a lot of evidence that she was a bad mean person and a lot of people didn't care for her and she was she's just she was just a bitch that's what that's what her evidence is and we got rid of her he never he talks about all of her sins but he never talks about did the district court adhere to the rules in Torgerson and Reeves versus Sanderson plumbing products say here's what a court doesn't do and here's what a court does and I just asked the court look at the second order which goes into detail about the evidence and see is it not true the court is making credibility decisions he's weighing the evidence and he's drawing inferences in favor of the University when there's an inference to be drawn in favor of dr. Fatemi the I've discussed the fact there were no women is it a reasonable inference from it at least that there must be a problem that they've never ever graduated a woman from residency program in neurosurgery then that in that a fair inference to be drawn instead of judge says well there were a couple women in it and it's not their fault they didn't graduate well that's an inference in favor of the University and that's inappropriate the if I get I'm out of town time so I'll listen in thank you very much we thank you for your arguments both here today and in your briefs and we will consider them and be back with you an opinion as soon as we can thank you